711 So.2d 924 (1997)
ALLSTAR HOMES, INC., d/b/a Best Value Mobile Homes, et al.
v.
Rex WATERS.
1951955.
Supreme Court of Alabama.
November 21, 1997.
Rehearing Overruled March 20, 1998.
*925 A. Joe Peddy and David A. Hughes of Smith, Spires & Peddy, P.C., Birmingham, for appellants.
Scott A. Powell and Bruce J. McKee of Hare, Wynn, Newell & Newton, Birmingham, for appellee.
A. Joe Peddy, David A. Hughes, and Jacob C. Swygert of Smith, Spires & Peddy, P.C., Birmingham, for appellants (on application for rehearing).
Evan M. Tager and Harold S. Reeves of Mayer, Brown & Platt, Washington DC; and Phillip E. Stano, Washington, DC, for amicus curiae American Council of Life Insurance (on application for rehearing).
With Dissenting Opinion.
BUTTS, Justice.
Allstar Homes, Inc., doing business as Best Value Mobile Homes; and its agents Harold Dye and Phil Zuccala (hereinafter referred to collectively as "Allstar") appeal from the trial court's order denying their motion to compel arbitration of claims brought by the plaintiff, Rex Waters. We affirm.
In February 1995, Rex Waters entered into a contract with Allstar Homes for the purchase of a mobile home. The contract included an arbitration clause providing, in pertinent part:
"ARBITRATION. All disputes, claims or controversies arising from or relating to this Contract or the relationships which result from this Contract, or the validity of this arbitration clause or the entire Contract, shall be resolved by binding arbitration by one [arbitrator] selected by Assignee with consent of Buyer(s)...."
(Emphasis added.)
In November 1995, Waters sued Allstar Homes, alleging misrepresentation, breach of contract, and breach of warranty. Waters also alleged that Allstar Homes had violated the Magnusson-Moss Federal Trade Commission Improvement Act, 15 U.S.C. §§ 2301-2312. Waters claimed that Allstar Homes, through its agent Harold Dye, misrepresented to him that, in return for a down payment of $6,000, he would receive an interest rate of 10.5% on his installment contract for the mobile home. He further claimed that, at the close of the sale of the home, Allstar Homes, through its agent Phil Zuccala, represented to him that if he did not agree to a 12% interest rate, he could not buy the mobile home and that he would lose his $6,000 down payment. Waters claimed that, to avoid losing his down payment, he agreed to the 12% interest rate for the purchase of the mobile home. He claimed that Allstar Homes did not deliver to him the new mobile home that it had purported to sell him, but, instead, delivered a used mobile home with extensive defects.
Allstar moved to compel arbitration of Waters's claims, arguing that the broad language of the arbitration clause in the purchase agreement encompassed all of Waters's claims. Waters opposed the motion, arguing that the purchase agreement was an adhesion contract and that he was fraudulently induced to agree to its provisions, including the arbitration clause. The trial court denied Allstar's motion to compel arbitration, holding that Waters was "entitled to a trial under general contract law principles to determine the validity of the arbitration clause " (emphasis added).
Allstar construes the trial court's order to be a final denial of arbitration of all the claims in Waters's complaint. Allstar points out that Waters's complaint challenged the validity of the contract as a whole, not merely the validity of the arbitration clause, and argues that federal law requires that his claims should thus be submitted to arbitration, pursuant to Prima Paint Corp. v. Flood *926 & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Allstar, relying on Prima Paint, argues that only claims of fraud in the making of an arbitration clause specifically, as opposed to claims of fraud in the making of the contract as a whole, are appropriate for judicial consideration and that the trial court should therefore have granted its motion to compel arbitration of Waters's claims.
Allstar's argument is based upon a flawed reading of the trial court's order; the trial court has not denied arbitration of the claims in Waters's complaint. Rather, the trial court has merely ordered further proceedings upon the narrow threshold issue of whether there is a valid agreement to arbitrate those claims. As we will discuss below, the trial court's order does not conflict with the Federal Arbitration Act, 9 U.S.C. §§ 1 16, or the United States Supreme Court's interpretation of the FAA in Prima Paint.
The FAA clearly provides that, in ruling upon a motion to compel arbitration, a court shall make an order directing the parties to proceed with arbitration, "upon [the court's] being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. However, "[if] the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." Id.
In Prima Paint, a contract between the parties included an arbitration clause providing that "[a]ny controversy or claim arising out of or relating to" the contract would be submitted to arbitration. 388 U.S. at 398, 87 S.Ct. at 1803. The plaintiff brought an action in a federal court to rescind the contract on the basis of alleged fraudulent inducement. At the same time, the plaintiff moved to enjoin the defendant from seeking arbitration of the matter, arguing that, because the right of arbitration arose solely under the contract, the defendant had no right of arbitration until the trial court first determined whether the contract as a whole was a product of fraudulent inducement. The defendant cross-moved to stay the court action pending arbitration, arguing that it was not necessary to determine the validity of the contract as a whole before invoking the arbitration clause, if the plaintiff did not specifically allege that the arbitration clause itself was invalid. The federal district court and the court of appeals agreed with the defendant, holding that, "except where the parties otherwise intend[,] arbitration clauses as a matter of federal law are `separable' from the contracts in which they are embedded, and that where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud." 388 U.S. at 402, 87 S.Ct. at 1805.
In affirming, the United States Supreme Court sought to further the "congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts." 388 U.S. at 404, 87 S.Ct. at 1806. In an effort to promote the enforcement of arbitration clauses with as little impediment as possible, the United States Supreme Court created a "rule of severability," which would allow arbitration clauses to be enforced even where the contract as a whole may be voidable. Section 4 of the FAA directs a trial court to order arbitration once it is satisfied that an agreement for arbitration has been made and has not been honored; thus, the Court reasoned, if the arbitration agreement itself was not specifically attacked and found to be flawed, then it must be enforced and all disputes within its scope submitted to the arbitrator. The Court held, in pertinent part:
"[The] answer is to be found in § 4 of the Act, which provides a remedy to a party seeking to compel compliance with an arbitration agreement.... [I]f the claim is fraud in the inducement of the arbitration clause itselfan issue which goes to the `making' of the agreement to arbitrate the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.... We hold, therefore, that in passing upon a § 3 application for a stay while the parties arbitrate, a *927 federal court may consider only issues relating to the making and performance of the agreement to arbitrate."
388 U.S. at 403-04, 87 S.Ct. at 1806 (footnotes omitted).
The Supreme Court did not address the incongruity of enforcing one provision of a contract before it is determined that the contract itself is valid, nor did it recognize that the purpose of the FAA is to place arbitration agreements on the same footing as other contracts, not to elevate them. However, even in its efforts to promote arbitration as a means of dispute resolution, the Prima Paint Court plainly recognized that, under the FAA, "issues relating to the making and performance of the agreement to arbitrate" are to be determined by the trial court, and that claims of fraud in the inducement of the contract as a whole may be submitted to arbitration only after the court is satisfied that the making of the arbitration agreement itself is not at issue.
Although some jurisdictions have construed Prima Paint to require arbitration of any claim in the complaint unless there has been "an independent challenge [in the complaint] to the making of the arbitration clause itself," Unionmutual Stock Life Ins. Co. of America v. Beneficial Life Ins. Co., 774 F.2d 524, 529 (1st Cir.1985), this Court has agreed with the "majority of courts [that have], on better reasoning, read Prima Paint more narrowly." Shearson Lehman Bros., Inc. v. Crisp, 646 So.2d 613, 616 (Ala.1994). In Crisp, this Court quoted with approval the following reasoning from the Court of Appeals for the Ninth Circuit:
"`[W]e read Prima Paint as limited to challenges seeking to avoid or rescind a contractnot to challenges going to the very existence of a contract that a party claims never to have agreed to....
"`Under this view, Prima Paint applies to "voidable contracts"those "where one party was an infant, or where the contract was induced by fraud, mistake, or duress, or where breach of a warranty or other promise justifies the aggrieved party in putting an end to the contract." If the dispute is within the scope of an arbitration agreement, an arbitrator may properly decide whether a contract is "voidable" because the parties have agreed to arbitrate the dispute. But, because an "arbitrator's jurisdiction is rooted in the agreement of the parties," ... a party who contests the making of a contract containing an arbitration provision cannot be compelled to arbitrate the threshold issue of the existence of an agreement to arbitrate. Only a court can make that decision.'"

646 So.2d at 616, 617 (quoting Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., 925 F.2d 1136, 1140-41 (9th Cir.1991)) (citation omitted; emphasis added).
This view of Prima Paint is the better means of reconciling the United States Supreme Court's "rule of severability," which allows the enforcement of an arbitration agreement within an otherwise unenforceable contract, with § 3 and § 4 of the FAA, which require the court to rule on disputes concerning the making or enforcement of arbitration agreements, i.e., the "arbitrability" of claims, before such claims can be submitted to arbitration. Thus, as the Supreme Court stated in Prima Paint, the issue of fraud in the inducement of the contract as a whole may be submitted to arbitration, but only after the trial court has first ruled upon disputes as to the making or enforcement of the arbitration agreement itself.
Allstar argues that, since Prima Paint was decided, the Supreme Court has held that parties may agree to arbitrate even the initial issues of arbitrability that are, under the FAA, to be decided by the trial court. In AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), the Supreme Court reiterated that arbitration is a matter of contract and that a party cannot be required to submit to arbitration any dispute he has not agreed to submit. The Court stated:
"The second rule, which follows inexorably from the first, is that the question of arbitrabilitywhether [an agreement] creates a duty for the parties to arbitrate a particular grievanceis undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide *928 otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."
475 U.S. at 648, 106 S.Ct. at 1418 (citations omitted; emphasis added).
Although the Court may have suggested that the parties could conceivably agree to submit the issue of arbitrability to the arbitrator, it did not elaborate on this point; rather, the Court emphasized that if the parties allowed an arbitrator to "determine his own jurisdiction," then the "arbitrator would not be constrained to resolve only those disputes that the parties have agreed in advance to settle by arbitration, but, instead, would be empowered `to impose obligations outside the contract limited only by his understanding and conscience.'"AT & T, 475 U.S. at 651, 106 S.Ct. at 1419 (citations omitted). The Court stated that this result "is antithetical to the function of [an] agreement as setting out the right and duties of the parties." Id.
In First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), the Supreme Court again suggested that parties could submit the issue of arbitrability to the arbitrator, by holding that issues of arbitrability are undeniably issues for judicial determination, unless there is "clear and unmistakable evidence" that the parties intended otherwise. 514 U.S. at 944, 115 S.Ct. at 1924. In First Options, a dispute arose as to the payment of certain debts owned under a stock "workout agreement" between First Options of Chicago and Manuel Kaplan, Kaplan's wife, and Kaplan's wholly owned investment company. The agreement was contained in four separate documents, one of which contained an arbitration clause; however, neither of the Kaplans signed the document containing the arbitration clause. First Options sought arbitration of the dispute before a stock exchange panel; the Kaplans filed an objection before the arbitration panel, arguing that because they had not signed the arbitration agreement they had not agreed to submit the dispute to arbitration. The arbitration panel determined that First Options' claims were arbitrable, then ruled in favor of First Options as to the merits of the dispute. 514 U.S. at 940-41, 115 S.Ct. at 1922-23.
The Kaplans filed a motion in the federal district court to vacate the arbitration panel's decision; the court denied the motion. However, the court of appeals reversed that denial, holding that the Kaplans had not agreed to arbitration and that their participation, under protest, in arbitration was not evidence of an agreement to forgo a judicial determination of whether First Options' claims were arbitrable, even though they did not initially seek such a determination. Kaplan v. First Options of Chicago, 19 F.3d 1503 (3d Cir.1994).
In affirming the court of appeals' decision, the Supreme Court reasoned that, because arbitration is a matter of contract, "the question `who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." First Options of Chicago, Inc. v. Kaplan, 514 U.S. at 943, 115 S.Ct. at 1923 (emphasis original). The Court thus signaled that the issue of arbitrability might be taken from the court and placed within the jurisdiction of an arbitrator, if the parties agreed that it would be. However, the Court went on to discuss the manner by which the courts should decide whether the parties agreed to arbitrate the issue of arbitrability. The Court recognized that, when determining issues as to the scope of arbitration, i.e., what kinds of disputes are covered by the arbitration agreement, it has promoted the rule that "`"any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."`" 514 U.S. at 945, 115 S.Ct. at 1924, quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). However, the Court emphasized that the preliminary question of arbitrability, i.e., whether the parties ever actually agreed to the arbitration clause itself, thereby relinquishing their right to a court's decision about the merits of a dispute, is not subject to a presumption favoring arbitration. Thus, while the Supreme Court indicated that parties could conceivably agree to arbitrate issues of arbitrability, it is for the courts to determine whether there is "clear and unmistakable" evidence that there was *929 such an agreement. See 514 U.S. at 944, 115 S.Ct. at 1924.
Allstar stresses that the arbitration agreement in Waters's purchase contract states that "[a]ll disputes ... arising from or relating to ... the validity of the arbitration clause ... shall be resolved by ... arbitration." Allstar argues that this language is clear and unmistakable evidence that the parties agreed to arbitrate the initial issue of arbitrability and that the trial court must surrender its power under § 4 to determine those issues. Allstar points out that Waters signed the arbitration agreement, and it concludes that the trial court thus had no authority to determine the validity of the arbitration clause and was required to grant its motion to compel arbitration, without ordering further proceedings.
We must emphasize that any arbitration agreement is a waiver of a party's right under Amendment VII of the United States Constitution to a trial by jury and, regardless of the federal courts' policy favoring arbitration, we find nothing in the FAA that would permit such a waiver unless it is made knowingly, willingly, and voluntarily.[1] The FAA provides no mechanism whereby the parties may wholly circumvent the court's authority to determine whether the parties have agreed to waive their right to have their disputes heard in a judicial forum. Although the United States Supreme Court has signaled that it is possible for parties to agree to arbitrate at least some issues of arbitrability, it has clearly held that the preliminary decision as to whether there is any such agreement is for the courts to make. First Options of Chicago, Inc. v. Kaplan, supra.
The fact that an arbitration agreement may state upon its face that issues of arbitrability will be subject to arbitration is not, standing alone, "clear and unmistakable" evidence that the parties truly intended to agree to such a condition. Arbitration clauses, even ones purporting to encompass the issue of arbitrability, are not self-proving; on the contrary, an arbitration agreement, like any other contract, is subject to generally applicable contract defenses, such as fraud, duress, or unconscionability. Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). It is well established that the FAA does not require parties to arbitrate a dispute that they did not agree to submit to arbitration, and the trial court must decide whether the parties so agreed.
In determining whether there is clear and unmistakable evidence that the parties agreed to submit the issue of arbitrability to the arbitrator, "the related and antecedent issue of whether an agreement to arbitrate is a contract of adhesion, fraudulently induced, or otherwise revocable, is an issue for the court as well, because essential to the First Options inquiry is the assumption that an agreement to arbitrate was made voluntarily." Aviall, Inc. v. Ryder System, Inc., 913 F.Supp. 826, 831 (S.D.N.Y.1996), affirmed, 110 F.3d 892 (2d Cir.1997). "[A]ll issues of arbitrability must first be determined by the court, including the issue whether the contract very clearly grants the arbitrators the power to decide even preliminary issues of arbitrability." Ex parte Williams, 686 So.2d 1110, 1112 (Ala.1996) (Houston, J., concurring in the result). "If there is doubt as to whether such an agreement exists, the matter, upon a proper and timely demand, should be submitted to a jury. Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." Shearson Lehman Bros. v. Crisp, 646 So.2d at 617, quoting Three Valleys Municipal Water Dist., 925 F.2d at 1140, quoting in turn Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, *930 54 (3d Cir.1980). Moreover, in making this decision, the trial court indulges no presumption in favor of arbitration. First Options. If, after assessing the claims asserted and determining the scope of the arbitration agreement involved, the court determines that the making or enforcement of the arbitration agreement is "at issue," the court may order further proceedings before the trier of fact. 9 U.S.C. § 4; see, also, Allied-Bruce Terminix Companies v. Dobson, 684 So.2d 102, 108 (Ala.1995). "A court's duty in determining whether the making or the performance of an agreement to arbitrate is in issue is analogous to its duty in ruling on a motion for summary judgment.... The court is to hold a hearing and determine whether there are genuine issues concerning the making or performance of an agreement to arbitrate...." Allied-Bruce Terminix, at 108.
The trial court has not permanently denied arbitration of Waters's claims against Allstar; rather, it has found that the making of the arbitration clause is "at issue" and it has properly ordered further proceedings to determine the validity of the arbitration clause, under § 4 of the FAA. We find no error in the trial court's order, and it is therefore affirmed.
AFFIRMED.
ALMON, SHORES, HOUSTON, and KENNEDY, JJ., concur.
COOK, J., concurs specially.
HOOPER, C.J., and MADDOX and SEE, JJ., dissent.
COOK, Justice (concurring specially).
I concur in all respects with the majority opinion. I write specially, however, to elaborate on a point raised in that opinion, namely:
"[A]ny arbitration agreement is a waiver of a party's right under Amendment VII of the United States Constitution to a trial by jury and, regardless of the federal courts' policy favoring arbitration, [there is] nothing in the FAA [the Federal Arbitration Act, 9 U.S.C. §§ 1-16] that would permit such a waiver unless it is made knowingly, willingly, and voluntarily."
711 So.2d at 929 (footnote omitted).
An issue central to this dispute is whether Rex Waters's signature to the "Manufactured Home Retail Installment Contract and Security Agreement" containing the arbitration clause was procured through economic duress and coercion. Essentially, Waters alleges that, after he had negotiated what he believed to be his best possible deal with the defendants, and after he had parted with a down payment of $6,000, he was then confronted with written material that contradicted the oral agreement. He alleged that this material contained, in addition to the contradictory terms, an arbitration clause, for which he had neither bargained nor contemplated. He states that his acquiescence to the new termsincluding the arbitration clausewas procured by threats of the loss of his $6,000 down payment on the purchase of a mobile home.
If these allegations are true, then the specific enforcement of the arbitration clause in this contract would be barred for the fundamental reason that it violates the Seventh Amendment. The Seventh Amendment provides:
"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of the United States, than according to the rules of the common law."
A review of the legislative history of the FAA establishes the rationale for, and compels, this conclusion.
In December 1922, S. 4214 and H.R. 13522 were introduced in the Senate and House of Representatives, respectively. Each bill was entitled: "A Bill to Make Valid and Enforceable Written Provisions or Agreements for Arbitration of Disputes Arising Out of Contracts, Maritime Transactions, or Commerce Among the States or Territories or with Foreign Nations." A hearing was subsequently held on S. 4214 before a subcommittee of the Senate Judiciary Committee. Much of the discussion in that hearing focused on the relationship between the proposed legislation *931 and the contractual waiver of the right to a trial by jury, where the contract containing the arbitration provision was one of adhesion. The following colloquy between Senator Walsh and Mr. W.H.H. Piatt,[2] who argued in favor of passage of S. 4214, is an exemplary excerpt from that hearing:
"Senator WALSH of Montana. This has occurred to me. I see no reason at allI see none now; there may be some reason but I see no reason nowwhy, when two men voluntarily agree to submit their controversy to arbitration, they should not be compelled to have it decided that way.
"Mr. PIATT. Yes, sir.
"Senator WALSH of Montana. The trouble about the matter is that a great many of these contracts that are entered into are really not voluntarily [sic] things at all. Take an insurance policy; there is a blank in it. You can take that or you can leave it. The agent has no power at all to decide it. Either you can make that contract or you can not make any contract. It is the same with a good many contracts of employment. A man says[:] `These are our terms. All right, take it or leave it.' Well, there is nothing for the man to do except to sign it; and then he surrenders his right to have his case tried by the court, and has to have it tried before a tribunal in which he has no confidence at all.

"Mr. PIATT. That would be the case in that kind of a case, I think; but it is not the intention of this bill to cover insurance cases.

"Senator WALSH of Montana. Well, take a freight contracta transportation contract. Here is a regular form of contract for the shipment of goods. Take a shipment of cattle, for instance. The railroad company puts up a contract having a provision for arbitration. Now, the shipper says, `Well, I haven't any confidence in this arbitration business. I don't want to do that.' [The shipper says:] `Very well; we can not take your stock then.'
"Mr. PIATT. Do you think that would override or transcend the act of Congress with respect to what constitutes a bill of lading? Would not the bill of lading act govern that anyway?
"Senator WALSH of Montana. Certainly, but the bill of lading provides what shall go in.
"Mr. PIATT. Yes.
"Senator WALSH of Montana. And then they have the regular bill of lading contract, but they have a further provision that any controversy arising under the contract shall be submitted to arbitration; and the fellow says[:] `Well, I haven't any confidence in it. If I have a controversy[,] I would like to have it tried before a court, where I feel I can get justice.'
"Mr. PIATT. Speaking for myself, personally, I would say I would not favor any kind of legislation that would permit the forcing [of] a man to sign that kind of a contract. I can see where that could be, right now.

"Senator WALSH of Montana. You can see where they are not really voluntary contracts, in a strict sense.

"Mr. PIATT. I think that ought to be protested against, because it is the primary end of this contract that it is a contract between merchants one with another, buying and selling goods. The shipper is nearly always under a necessity.
"Senator WALSH of Montana. Yes."
Sales and Contracts to Sell in Interstate and Foreign Commerce, and Federal Commercial Arbitration, Hearing on S. 4213 and 4214 before a Subcommittee of the Committee on the Judiciary, 67th Cong., 4th Sess. 9-10 (1923) (emphasis added).
Additionally, a letter from then Secretary of Commerce Herbert Hoover was "submit[ted] for the record." Id. at 14. The letter was addressed to Senator Thomas Sterling, who introduced the bill, and it stated in part: "If objection appears to the inclusion *932 of workers' contracts in the law's scheme, it might be well amended by stating, `but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in interstate or foreign commerce.'" Id.
In response to these and similar comments from other Senators, S. 4214 and H.R. 13522 were revised and reintroduced in Congress the following year as S. 1005 and H.R. 646, respectively. Section 1 of those bills included the language suggested by Secretary Hoover excluding from the proposed law's application employment contracts of "seamen, railroad employees, [and every] other class of workers engaged in foreign or interstate commerce." Arbitration of Interstate Commercial Disputes: Joint Hearings on S. 1005 and H.R. 646, Bills to Make Valid and Enforceable Written Provisions or Agreements for Arbitration of Disputes Arising Out of Contracts, Maritime Transactions, or Commerce Among the States or Territories or with Foreign Nations, before the Subcommittees of the Committees on the Judiciary, 68th Cong., 1st Sess. 2 (1924) (hereinafter Joint Hearings) (emphasis added). S. 1005 was referred to the Judiciary Committee. Joint hearings were held on those bills before subcommittees of the Judiciary Committees. At the outset of those hearings, Mr. Piatt, who argued again in favor of passage, stated:
"[A] bill similar to [S. 1005] was before the Committee on the Judiciary of both the Senate and House last year, and certain hearings were held thereon. In view of questions by Senator Sterling, Senator Walsh of Montana, and other members, changes have been made, and the bill has been redrafted after being submitted to the American Bar Association meeting at Kansas City...."
Joint Hearings, at 10 (emphasis added).
The question of a contracting party's volition in the waiver of her right to a jury trial arose again in those hearings. For example, Julius H. Cohen, a principal draftsman of S. 1005, stated:
"The one constitutional provision we have got is that you have a right of trial by jury. But you can waive that. And you can do that in advance. Ah, but the question whether you waive it or not depends on whether that is your signature to the paper, or whether you authorized that signature, or whether the paper is a valid paper or not, whether it was delivered properly. So there is a question there which you have not waived the right of trial by jury on."
Joint Hearings, at 17 (emphasis added).
Accompanying S. 1005 for consideration in the Judiciary Committee was S.Rep. No. 536, 68th Cong., 1st Sess. (1924), which was submitted by Senator Sterling. He offered the following pertinent comments regarding the purpose of S. 1005:
"Various reasons have been given for these ancient rules of English law [refusing specifically to enforce arbitration provisions], followed as they have been by our State and Federal courts. Among these reasons were, first, the expressed fear on the part of the courts that arbitration tribunals did not possess the means to give full or proper redress, and also the doubt they entertained as to their right to compel an unwilling party to submit his cause to such a tribunal, thus denying to him the right to submit the same to the ordinary courts of justice for hearing and determination.
"....
"... The record made under the [Arbitration Society of America] shows not only the great value of voluntary arbitrations but the practical justice in the enforced arbitration of disputes where written agreements for that purpose have been voluntarily and solemnly entered into."
Id. at 2-3 (emphasis added).
On February 12, 1925, the 68th Congress enacted H.R. 646, entitled, "An Act To Make Valid and Enforceable Written Provisions or Agreements for Arbitration of Disputes Arising Out of Contracts, Maritime Transactions, or Commerce Among the States or Territories or with Foreign Nations." 43 Stat. 883, codified as amended at 9 U.S.C. § 1 et seq. That act was, of course, the FAA.
These comments by the proponents, drafters, and sponsors of the bills that culminated *933 in the FAA, in addition to the revision that excluded employment contracts, illustrate the importance ascribed to the voluntariness of the contracting parties. Indeed, volition is the sine qua non of the FAA's constitutionality, for specific enforcement of an arbitration provision to which a party has not voluntarily agreed would clearly violate the Seventh Amendment.
Indeed, specific enforcement of arbitration contracts for the purchase of consumer goods or services is beset by a number of problems implicating the Seventh Amendment. The reality is that contracts containing these provisions appear with increasing frequency in today's marketplace. As a result, consumers find it increasingly difficult to acquire basic goods and services without forfeiting their rights to try before a jury the common-law claims that may accrue to them. Entire segments of the market for certain goods and services, such as automobile sales and their attendant necessary financing, are being closed to consumers who are unwilling to forfeit the rights guaranteed them by the federal and state constitutions. To sanction this market closure would essentially effect the repeal of the Seventh Amendment by the concurrence of judicial with legislative fiat.
Moreover, the coerced waiver of the right to a trial by jury results in a monetary penalty to the consumer. This is so because it deprives the consumer purchaser or debtor of the benefit of his bargain, along with the time he spent and the expense he incurred in negotiating it. More specifically, many consumer credit transactions containing "agreements" to arbitrate actually involve two independent "agreements." The credit sale of a new automobile, for example, is, according to ordinary experience, often consummated between the consumer-buyer and an agent of the automobile dealer only after hours, or, in some cases, days, of bargaining and negotiation. Although a number of terms important to both parties may be involved in these negotiations, one term that seldom, if ever, arises during the bargaining process is arbitration. Indeed, it may safely be said that the thought of specific constitutional provisions never impresses itself upon the mind of the consumer-buyer, and, seldom, if ever, upon the mind of the dealer's agent, before an agreement has been reached on the lot or the showroom floor encompassing all the essential terms of the sale.
After the consummation of such a "showroom" agreement, the buyer, is, for the first time, then presented with "take-it-or-leave-it" written documents. These documents do not merely memorialize the terms of the prior agreement, but contain a pivotal term, one that was not negotiated and that is, as in this case, non negotiable. At that stage, the buyer typically learns, for the first time, that in order to receive the benefit of the bargain he has already consummated, and to avoid incurring a monetary penalty consisting of the time he spent and the expense he incurred in negotiating that bargain he must then agree to waive his right to a trial by jury.
This second "agreement" constitutes a modification of the first and is a new contract, see Little v. Redditt, 264 Ala. 371, 88 So.2d 354 (1956), subject to the rules regarding consideration and mutual assent set forth in Winegardner v. Burns, 361 So.2d 1054, 1057-58 (Ala.1978) (quoting with approval Moore v. Williamson, 213 Ala. 274, 104 So. 645 (1925)). The consumer must either sign the contract, and, thereby, waive his Seventh Amendment guarantee, or begin the process anew elsewhere. Because of the penalty that results from such a waiver, the specific enforcement of an adhesion contract containing an arbitration provision places the Seventh Amendment on a different footing than U.S. Const. amend. IV (guaranteeing freedom from "unreasonable searches and seizures"), amend. V (guaranteeing freedom from forced self-incrimination), and amend. VI (guaranteeing the right to legal counsel in criminal proceedings).
To be sure, rights guaranteed by the Fourth, Fifth, and Sixth Amendments can also be waived. "[A] person may waive his Fourth Amendment protection by consenting to a warrantless search. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)." Windham v. State, 599 So.2d 95, 96 (Ala.Crim.App.1992). But the consent must be voluntary, Ex parte Wilson, 571 So.2d 1251, 1255 (Ala.1990), and the only *934 consequence of the waiver is that "all evidence discovered during the consensual search may properly be admitted into evidence. United States v. Wright-Barker, 784 F.2d 161, 176 (3d Cir.1986)." Colbert v. State, 615 So.2d 1213, 1214 (Ala.Crim.App. 1992), rev'd on other grounds, 615 So.2d 1218 (Ala.1992). Likewise, a person in police custody may waive his Fifth and Sixth Amendment rights. Before he does so, however, he is entitled to receive a warning as set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny. Moreover, the waiver must be made "voluntarily, knowingly, and intelligently," Ex parte Pardue, 661 So.2d 268, 269 (Ala.1994), and the only unalterable consequence of the waiver is that "`[a]ny statement given freely and voluntarily without any compelling influences [will be] ... admissible in evidence.'" Ex parte Godbolt, 546 So.2d 991, 996 (Ala.1987) (quoting Miranda).
Thus, the waiver of rights guaranteed by Amendments Four, Five, and Six is not punitive, as is the case with the specific enforcement of an arbitration provision to which a consumer is ultimately required to acquiesce in order to avoid losing the value of the time he expended and the expense he incurred in negotiations before learning of the arbitration requirement. Because arbitration provisions are, in consumer transactions, such as the one hypothesized above, virtually "foisted" upon unsuspecting and unsophisticated consumers, and because the result is often punitive to the consumer, the right guaranteed by the Seventh Amendment is accorded less deference than those rights guaranteed by the Fourth, Fifth, and Sixth Amendments.
The fact that the United States Supreme Court has never held the Seventh Amendment to be binding on the states through the Fourteenth Amendment, as it has certain other of the Bill of Rights guarantees, is irrelevant in this context. This is because the FAA is not a state law. Thus, the constitutional deprivation, where one can be shown, derives from an act of Congress, not a state legislature. The Seventh Amendment, like the other Bill of Rights provisions, was ratified as a limitation on the power of Congress. Clearly, Congress had no power to deprive a citizen of Alabama of his right to a trial by jury before the Fourteenth Amendment was ratifieda fortiori, it has none now. Therefore, whether the Seventh Amendment is binding on the states is entirely irrelevant in any consideration of the FAA.
But it has been said, and rightly so, that "[p]robably no greater encomiums or panegyrics have ever been pronounced upon any legal or civil right than upon this right of trial by jury." Alford v. State ex rel. Attorney General, 170 Ala. 178, 187, 54 So. 213, 215 (1910) (Mayfield, J., dissenting). "[I]t has been from very early time insisted upon, by our ancestors, as `the great bulwark of their civil and political liberties,' and watched with unceasing jealousy and solicitude...." Id. "[T]he Constitution of the United States would have been justly obnoxious to the most conclusive objection if it had not recognized and confirmed it in the most solemn terms...." Id. (Emphasis added.)
For these reasons, I would hold that in a consumer-transaction case involving a contract containing an arbitration provision, unless there is a showing that the consumer entered the arbitration agreement voluntarily, the contract will be unenforceable as an encroachment on the right to trial by jury. I offer the following comments as guidance to parties desiring to avoid this result.
If the offeror of consumer goods or services intends to insist upon the arbitration of disputes arising out of its consumer transactions, it must clearly integrate the arbitration requirement with the terms of the transaction that the consumer would consider essential, such as the price of the goods or services and the size and number of the payments. In other words, the consumer must be apprised of his right to a trial by jury and must be given an opportunity to accept or reject arbitration in a manner similar to the choice commonly given consumers either to purchase or refuse credit life or disability insurance. Such a procedure is merely analogous to the warning given pursuant to Miranda v. Arizona 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), to ensure that other enumerated rights under the Bill of Rights have been voluntarily waived. This would provide *935 one way in which objective evidence as to the level of volition could be demonstrated.
In my consideration of this case, I have not overlooked Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). In Casarotto, the United States Supreme Court reviewed Mont. Code Ann. § 27-5-114(4), which provided: "Notice that a contract is subject to arbitration... shall be typed in underlined capital letters on the first page of the contract; and unless such notice is displayed thereon, the contract may not be subject to arbitration." 517 U.S. at 683, 116 S.Ct. at 1654 (emphasis added).
Holding that the statute ran afoul of, and, consequently, was preempted by, the FAA, the Court explained: "Courts may not ... invalidate arbitration agreements under state laws applicable only [emphasis in Casarotto] to arbitration provisions.... Section 27-5-114(4) of Montana's law places arbitration agreements in a class apart from `any contract,' and singularly limits their validity." 517 U.S. at 687, 116 S.Ct. at 1656-57 (emphasis added).
The rule I would establish in consumer cases like this one differs fundamentally from the statute preempted in Casarotto in a number of ways. First, the Montana statute did not turn on whether the contract was a contract of adhesion. Thus, unlike the rule I propose, it did not invoke a Seventh Amendment analysis. Moreover, the Montana statute, § 27-5-114(4), affected contracts on purely state-law grounds, while the rule I propose is grounded on the guarantees of the federal Constitution. The FAA may, indeed, preempt state law, but it cannot preempt the Seventh Amendment of the federal Constitution.
In this case, not only was Waters, as was the consumer in the example hypothesized above, forced to acquiesce in the waiver in order to avoid the penalty inherent in such transactions, he was further coerced by the threatened loss of his $6,000. Assuming the truth of his allegations, the waiver was clearly involuntary. Consequently, enforcement of the arbitration provision contained in the "Manufactured Home Retail Installment Contract and Security Agreement" would violate the Seventh Amendment.
HOOPER, Chief Justice (dissenting).
The majority's analysis confuses the question of the validity of an arbitration clause and the question of fraud in the inducement of a contract containing an arbitration clause. In its decisions, the United States Supreme Court has clearly distinguished between the two.
In First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), at issue were four documents involving four different partiesFirst Options, Manuel Kaplan, Carol Kaplan, and MKI, Manuel Kaplan's wholly owned investment company. MKI had signed the agreement containing the arbitration clause, but Manuel and Carol had not. The United States Supreme Court decided there was no agreement to arbitrate between the Kaplans and First Options, a very different decision from that Court's holding in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). In fact, the First Options Court never mentions Prima Paint. Each case involves a totally different analysis.[3] Yet the majority has mingled those analyses together and implied that First Options overrules Prima Paint. Prima Paint`s holding does not disagree with the assertion that a court should decide the existence of a valid arbitration agreement, nor do I disagree. That is not a new breakthrough that the First Options Court made; that principle has always applied to arbitration, and it is based on the *936 FAA.[4] However, that is not the question in this case. Waters clearly agreed to arbitrate "all disputes, claims or controversies" arising from this contract. The existence of a valid arbitration agreement that involves interstate commerce is not at issue in this case.
In Prima Paint, the facts were vastly different from those of First Options. However, the Prima Paint facts are very similar to the facts in the case at bar. In Prima Paint, Flood & Conklin ("F & C") entered into a consulting agreement with Prima Paint. The parties in that case executed the agreement at issue less than three weeks after the execution of a contract by which Prima Paint purchased F & C's paint business. That contract involved F & C's giving customer lists to Prima Paint, covenants not to compete, and the payment of certain percentages of receipts to F & C. F & C represented to Prima Paint that it was solvent and able to perform its contractual obligations. In fact, F & C was insolvent at the time it entered into the contract. F & C filed for bankruptcy protection one week after the signing of the contract. F & C also served notice of intention to arbitrate because the contract contained an arbitration clause. Prima Paint sued, claiming fraud in the inducement of the contract containing the arbitration clause. The United States Supreme Court held that arbitration was the appropriate forum for the dispute:
"We hold, therefore, that in passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate. In so concluding, we not only honor the plain meaning of the [FAA] but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to the contract, be speedy and not subject to delay and obstruction in the courts."
388 U.S. at 404, 87 S.Ct. at 1806. The Supreme Court held that the arbitration clause itself was separable from the contract:
"Under § 4, with respect to a matter within the jurisdiction of the federal courts save for the existence of an arbitration clause, the federal court is instructed to order arbitration to proceed once it is satisfied that `the making of the agreement for arbitration or the failure to comply [with the arbitration agreement] is not in issue.'"
388 U.S. at 403, 87 S.Ct. at 1806.
"In the present case no claim has been advanced by Prima Paint that F & C fraudulently induced it to enter into the agreement to arbitrate `[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof.' This contractual language is easily broad enough to encompass Prima Paint's claim that both execution and acceleration of the consulting agreement itself were procured by fraud. Indeed, no claim is made that Prima Paint ever intended that `legal' issues relating to the contract be excluded from arbitration, or that it was not entirely free so to contract."
388 U.S. at 406, 87 S.Ct. at 1807.
This last statement applies to Waters's case. In his complaint, filed November 3, 1995, Waters made no claim that Allstar Homes fraudulently induced him to enter into the agreement to arbitrate "[a]ll disputes, claims or controversies arising from or relating to this Contract." The trial judge's order written on the case action summary states: "Plaintiff made the claim ... that the contract itself was induced by coercion and/or fraud." (Emphasis added.) Of course, the courts always decide whether there exists an arbitration agreement before ordering arbitration to proceed. The courts decide whether the transaction involves interstate commerce, also. The courts do not decide whether the contract itself was induced by fraud. That is for the arbitrator.
The majority implies that Prima Paint`s holding places arbitration clauses in an invalid *937 preferential position. That would be true if the decision had stated that a claim of fraud in the inducement of the clause containing the arbitration clause should also be arbitrated. In opposition to the majority's view, the United States Supreme Court stated that its principle that separates the arbitration agreement from the contract as a whole creates a level playing field for both. In other words, the Prima Paint decision made arbitration clauses as enforceable as other contracts, but not more so.[5]
The majority in this case, like Justice Black, who dissented in Prima Paint, misunderstands the concept of arbitration. If a party agrees to arbitrate all disputes relating to the contract, then that party has agreed to arbitrate disputes as to any alleged fraud in creating the contract in the first place. It is not legitimate to argue, although Justice Black attempted to, that no one but a lawyer can recognize fraud and order rescission of a contract. An arbitrator is capable of that. The question becomes whether a party can show a court that he or she was tricked into agreeing to the arbitration. If so, then, the arbitration clause itself is invalid. That is the duty of the courts, to determine whether to compel arbitration or not. If there is no arbitration agreement, then the courts should not compel arbitration.
Even if I accepted the argument that the rationale of First Options governs this case, I would still hold that arbitration is appropriate. In First Options, Justice Breyer stated:
"[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputesbut only those disputesthat the parties have agreed to submit to arbitration....
"We agree with First Options, therefore, that a court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to arbitration.... [A] fair and complete answer to the standard-of-review question requires a word about how a court should decide whether the parties have agreed to submit the arbitrability issue to arbitration. And, that word makes clear that the Kaplans did not agree to arbitrate arbitrability here."
514 U.S. at 943-44, 115 S.Ct. at 1924. The Kaplans in First Options did not agree to arbitration at all; Waters agreed to submit the question of arbitrability to an arbitrator. The agreement reads:
"All disputes, claims or controversies arising from or relating to this Contract or the relationships which result from this Contract or the validity of this arbitration clause or the entire Contract, shall be resolved by binding arbitration by one arbitrator selected by Assignee with consent of Buyer(s)."
(Emphasis added.) Nothing could be clearer. The following quotes from the majority opinion are not examples of clarity:
"[T]he Prima Paint Court plainly recognized that, under the FAA, `issues relating to the making and performance of the agreement to arbitrate' are to be determined by the trial court, and that claims of fraud in the inducement of the contract as a whole may be submitted to arbitration only after the court is satisfied that the making of the arbitration agreement itself is not at issue."
"The fact that an arbitration agreement may state upon its face that issues of arbitrability will be subject to arbitration is not, standing alone, `clear and unmistakable' evidence that the parties truly intended to agree to such a condition."
711 So.2d at 927 and 929. This language quoted from the majority opinion is merely a means by which this Court can avoid the plain language of decisions of the United States Supreme Court and the plain language of the arbitration agreement, in order to further delay the transfer of this dispute to its proper forumarbitration.
The agreement of the parties and federal law govern this question. There is no need for an opinion that ignores United States Supreme Court opinions and the clear and unequivocal language of the parties' contract. I would reverse the trial court's order denying *938 Allstar's motion to compel arbitration and order arbitration of Waters's claim against Allstar Homes.
MADDOX and SEE, JJ., concur.

On Application For Rehearing
BUTTS, Justice.
APPLICATION OVERRULED.
ALMON, SHORES, KENNEDY, and COOK, JJ., concur.
HOOPER, C.J., and MADDOX, HOUSTON, and SEE, JJ., dissent.
HOUSTON, Justice (dissenting).
Initially, I was persuaded that AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), controlled this case. I am now persuaded that it does not, but that Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), does. I do believe that "all issues of arbitrability must first be determined by the court, including the issue whether the contract very clearly grants the arbitrators the power to decide even preliminary issues of arbitrability." Ex parte Williams, 686 So.2d 1110, 1112 (Ala.1996) (Houston, J., concurring in the result).
In this case there is no claim of fraud in the inducement of the arbitration clause itself. See Prima Paint Corp. v. Flood & Conklin Mfg. Co., supra. The contract contained an arbitration clause that provided in pertinent part:
"[D]isputes, claims or controversies arising from or relating to this contract or the relationships which result from this contract, or the validity of this arbitration clause or the entire Contract, shall be resolved by binding arbitration...."

(Emphasis added.)
How can the trial court, using our rules of interpretation and construction of contracts, interpret these words to mean anything other than that the issue of arbitrability must be arbitrated? See Loerch v. National Bank of Commerce of Birmingham, 624 So.2d 552 (Ala.1993); American Standard, Inc. v. Goodman Equipment Co., 578 So.2d 1083 (Ala. 1991). It cannot; therefore, its order denying arbitration should be reversed.
The Supremacy Clause of the Constitution of the United States should trump state law again. See Terminix Int'l Co. v. Jackson, [Ms. 1961351, March 6, 1998] ___ So.2d ___ (Ala.1998) (Houston, J., dissenting, ___ So.2d at ___).
I dissent from the order overruling the application for rehearing.
MADDOX, J., concurs.
NOTES
[1] Although we do not address the full implications of waiving one's right to a trial by jury in favor of arbitration of disputes, we do point out that the due process safeguards found in judicial proceedings are largely absent in arbitration. The reputed informality and the relative speediness of an arbitration procedure are achieved by severely limiting discovery; imposing few evidentiary rules; giving the arbitrator almost unbridled discretion to make decisions without basing them on established principles of law or making written findings to support the arbitrator's conclusions; and providing virtually no right of appeal in the case of error in the arbitrator's decision.
[2] Piatt was the "chairman of the committee of commerce, trade, and commercial Law of the American Bar Association" and a vocal supporter of the proposed legislation. Sales and Contracts to Sell in Interstate and Foreign Commerce, and Federal Commercial Arbitration, Hearing on S. 4213 and 4214 before a Subcommittee of the Committee on the Judiciary, 67th Cong., 4th Sess. 7 (1923).
[3] "`[I]f the claim is fraud in the inducement of the arbitration clause itselfan issue which goes to the "making" of the agreement to arbitrate the federal court may proceed to adjudicate it. But the statutory language [of FAA § 4] does not permit the federal court to consider claims of fraud in the inducement of the contract generally.... We hold, therefore, that ... a federal court may consider only issues relating to the making and performance of the agreement to arbitrate.'"Wheat, First Securities, Inc. v. Green, 993 F.2d 814, 818 (11th Cir. 1993) (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967))(bracketed language added in Prima Paint).
[4] "The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.... If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.
[5] Prima Paint, 388 U.S. at 404, n. 12, 87 S.Ct. at 1806, n. 12.