718 So.2d 33 (1998)
Ex parte DAN TUCKER AUTO SALES, INC.
(In re John PHELPS v. DAN TUCKER AUTO SALES, INC., et al.).
1951866.
Supreme Court of Alabama.
July 2, 1998.
*34 John Martin Galese and Jeffrey L. Ingram of John Martin Galese, P.A., Birmingham, for petitioner.
E. Martin Bloom of Starnes & Atchison, Birmingham, for respondent.
HOOPER, Chief Justice.
Dan Tucker Auto Sales, Inc. ("Tucker"), the defendant in an action pending in the Jefferson Circuit Court, petitions for a writ of mandamus directing the Jefferson Circuit Court 1) to withdraw its order of July 29, 1996, directing Tucker to pay an arbitration filing fee and 2) to require the plaintiff, John Phelps, to pay that filing fee. We grant the petition. We conclude that Phelps, who filed the complaint in the circuit court, is the "claimant" and the "initiating party" for purposes of interpreting Rule 6 of the Commercial Arbitration Rules of the American Arbitration Association ("AAA").

Facts
Phelps's lawsuit against Tucker arose out of Tucker's sale of a used automobile to Phelps. Tucker asked the circuit court to compel arbitration, in accordance with the predispute arbitration agreement made by the parties on May 7, 1991. On June 12, 1995, the circuit court granted the motion to compel arbitration. Phelps petitioned this Court for a writ of mandamus directing the circuit court to rescind its order compelling arbitration. On December 22, 1995, this Court denied the writ. Ex parte Phelps, 672 So.2d 790 (Ala.1995).
After we denied the writ, Phelps asked the circuit court to direct Tucker to pay the arbitration filing fee. Phelps claimed that payment of arbitration fees might impose a hardship on him. On July 29, 1996, the circuit court ordered Tucker to pay the arbitration filing fee. Tucker now asks us to direct the circuit court to vacate that July 29, 1996, order.

Issue
The May 7, 1991, arbitration agreement signed by Tucker and Phelps specifically adopted the American Arbitration Association's Commercial Arbitration Rules.[1] Tucker argues that these rules require that Phelps file his demand with the American Arbitration Association and prepay the appropriate filing fee. Phelps claims that the rules provide that the "initiating party" is to file and pay the fee, and Phelps argues that
*35 Tucker is the initiating party because Tucker asked the court to compel arbitration. The question raised here is which of these parties is the "initiating party" as contemplated by the Commercial Arbitration Rules. We hold that Phelps, the plaintiff, is the initiating party.

Analysis
The Commercial Arbitration Rules of the American Arbitration Association (1993), made applicable by the parties' agreement, provide as follows:
"1. Agreement of Parties:
The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) or under its Commercial Arbitration Rules....
"....
"6. Initiation under an Arbitration Provision in a Contract:
(a) The initiating party (hereinafter claimant) shall ... give written notice to the other party (hereinafter respondent) of its intention to arbitrate (demand), which shall contain a statement setting forth the nature of the dispute, the amount involved, if any, the remedy sought, and the hearing locale requested, and
(b) shall file at any regional office of the AAA three copies of the notice and three copies of the arbitration provisions of the contract, together with the appropriate filing fee as provided in the schedule on page 21.
"The AAA shall give notice of such filing to the respondent or respondents. A respondent may file an answering statement in duplicate with the AAA within ten days after notice from the AAA, in which event the respondent shall at the same time send a copy of the answering statement to the claimant.
"....
"43. Scope of Award:
"... The arbitrator shall, in the award, assess arbitration fees....
"....
"48. Administrative Fees:
"....
"The filing fee shall be advanced by the initiating party or parties, subject to final apportionment by the arbitrator in the award.
"The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

"....
"52. Interpretation and Application of Rules:
"The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties....
Following the numbered rules appear these provisions:
"Administrative Fees:
"... Unless the parties agree otherwise,... administrative fees are subject to allocation by the arbitrator in the award.
"Filing Fees:
"A nonrefundable filing fee is payable in full by a filing party when a claim, counterclaim or additional claim is filed...."
(Emphasis added.)
According to the Commercial Arbitration Rules relating to "administrative fees," the party "initiating" the arbitration pays the "filing fee." See Rule 48. Therefore, whether Tucker is entitled to the writ depends upon the meaning of the term "initiating party" as it is used in the Commercial Arbitration Rules. The United States Supreme Court has held that arbitration contracts cannot be singled out and subjected to different or more stringent rules of construction. Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). Therefore, we answer this question by applying traditional rules of contract interpretation.
General contract law requires a court to enforce an unambiguous, lawful contract, as it is written. P & S Business, Inc. v. South Central Bell Telephone Co., 466 So.2d 928, 931 (Ala.1985). See also McDonald v. U.S. Die Casting & Development Co., 541 So.2d 1064 (Ala.1989). A court may not make a new contract for the parties or *36 rewrite their contract under the guise of construing it. Estes v. Monk, 464 So.2d 103 (Ala.Civ.App.1985). The contract between Phelps and Tucker is unambiguous. It is an agreement, lawfully entered into, to purchase a used car for a sum of money. This contract should be enforced as written.
Parties to a contract are bound by pertinent references therein to outside facts and documents. Green Springs Associates, Ltd. v. Green Springs Village, Ltd., 577 So.2d 872 (Ala.1991); Ben Cheeseman Realty Co. v. Thompson, 216 Ala. 9, 112 So. 151 (1927). "Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by the reference as a part of the contract and[,] therefore, may properly be considered in the construction of the contract." 17A Am.Jur.2d Contracts § 400 (1991). The contract between Tucker and Phelps declares that disputes are to be resolved through binding arbitration according to the AAA's Commercial Arbitration Rules; therefore, the agreement incorporates the language of the Commercial Arbitration Rules regarding the resolution of disputes.
When interpreting a contract, a court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state. Pacific Enterprises Oil Co. (USA) v. Howell Petroleum Corp., 614 So.2d 409 (Ala.1993). Words used in a contract will be given their ordinary, plain, or natural meaning where nothing appears to show they were used in a different sense or that they have a technical meaning. Smith v. Citicorp Person-to-Person Financial Centers, Inc., 477 So.2d 308 (Ala.1985). "[S]pecific terms and exact terms are given greater weight than general language." Restatement (Second) of Contracts § 203(c) (1981). Where words used in a contract are susceptible of more than one meaning, the courts will, if possible, ascertain from all the provisions of the contract the sense in which the words were used by the parties. Tennessee v. Whitworth, 117 U.S. 129, 6 S.Ct. 645, 29 L.Ed. 830 (1886).
Rule 6 of the Commercial Arbitration Rules states that the "initiating party (hereinafter claimant)" shall file the "appropriate filing fee" as mandated in the schedule accompanying the rules. That same rule later explains that after the "claimant" has stated the nature of the dispute, the respondent shall file an answering statement and send that statement to the claimant. The word "claimant" is defined in Black's Law Dictionary (6th ed.1990) as "[o]ne who claims or asserts a right, demand or claim." The word "respondent" is defined in Black's as "one who makes an answer to a bill or other proceeding in equity" or one "who contends against an appeal." Considering these words in light of their plain meaning, we conclude that the "claimant" is the party who makes a demand upon another party and that the "respondent" is the party who must answer the allegations.
If we apply these general definitions to the facts of this case, it would be awkward to interpret the Commercial Arbitration Rules to mean that Tucker is the claimant. Such an interpretation would force Tucker to state the nature of the claims against itself. Equally as awkward, this interpretation would then force Phelps to answer the very complaint that he filed against Tucker. It is unreasonable to believe that the parties in this case intended to apply the terms "initiating party" and "claimant" to Tucker, the party defending itself against a claim by Phelps. Judging from the plain meaning of these labels as they are used in the Rules and from what the parties intended by the terms "claimant" and "initiating party," it is clear that Phelps is the claimant and Tucker is the respondent.
Had Phelps initially honored the terms of his agreement to arbitrate instead of filing a civil action, he would have been required to file with the AAA a written demand for arbitration, accompanied with the appropriate prepaid filing fee. He obviously would have been considered the initiating party. The logical outcome of the circuit court's order would be that any claimant could avoid paying the filing fee by going into court first and forcing the defendant to move to compel arbitration.
*37 A dispute over this exact wording was addressed by the Court of Appeals of Arizona in A.P. Brown Co. v. Superior Court, 16 Ariz.App. 38, 490 P.2d 867 (1971). In that case, the plaintiffs sought damages for the defendants' alleged fraud in inducing them to enter into a contract for the purchase of real estate. The defendants successfully moved to stay the action on the grounds that the contract required submission of the dispute to arbitration. The plaintiffs then petitioned the trial court to order the defendants to pay the appropriate filing fees. The plaintiffs contended that they were not the "initiating party" because the court had ordered arbitration on the motion of the defendant. The Arizona Court of Appeals wrote:
"It is well settled that courts must give effect to a contract as written. Here, the parties' contract provided for submission of controversies to arbitration. * The arbitration provision expressly referred to the rules of the American Arbitration Association as controlling the mode of resolution. Therefore, the AAA's rule as to fees was incorporated into the contract by reference and the [plaintiffs] were bound thereby. Furthermore they cannot escape their contractual obligation by saying that they had not read the AAA rules.
"According to the association's rule with respect to administrative fees, the parties initiating the arbitration are required to advance fees. The [plaintiffs] contend that they are not `the initiating party' since arbitration was ordered by the court. This argument is clearly specious since the court merely found that the subject matter of the lawsuit filed by the [plaintiffs] should be submitted to arbitration as per their agreement and stayed the pending proceeding.
"*The respondent court, in apportioning the fees as it did, was apparently swayed by the claim of hardship. It should not, however, have permitted equitable considerations to obfuscate the plain terms of the agreement since the AAA rules themselves provide for relief in the event of hardship."
A.P. Brown Co., 16 Ariz.App. at 40-41, 490 P.2d at 869-70 (citations omitted). We find the reasoning of the Arizona Court of Appeals compelling.
Phelps argues that it might place a hardship upon him to force him to pay the filing fees, but, if it does, this alone should not permit this Court to substitute different meanings for the terms used by the parties. To do so would be contrary to Alabama law:
"Where a contract is unambiguous and plain in expression, we know of no canon of construction that warrants an interpretation the only effect of which is to relieve a party to the contract from consequences deemed by him hard or unfair. Where the parties express without ambiguity their intention, no court can alter the agreement, and no room for judicial construction is left."
Lilley v. Gonzales, 417 So.2d 161, 163 (Ala. 1982).
We should note, as did the Arizona Court of Appeals when it answered this same question in 1971, that our holding in no way precludes claimants under financial hardships from acquiring a resolution to contract disputes they have agreed to arbitrate. Phelps did not exhaust his administrative remedies as to the matter of the filing fee; he did not pursue the options provided for him under the AAA Commercial Arbitration Rules. Rule 48 specifically provides that the AAA can defer or reduce the administrative fees "in the event of extreme hardship on the part of any party."[2] Phelps has not yet asked the AAA to do this. It is also possible *38 under Rule 43 for the arbitrator to apportion all fees to one party or the other. The AAA's Commercial Arbitration Rules discourage frivolous claims, and, at the same time, they take into account the needs of financially distressed claimants.
The Jefferson Circuit Court is directed to vacate its July 29, 1996, order and to require Phelps, the "initiating party" referred to in the arbitration agreement, to prepay the costs for the arbitration.
WRIT GRANTED.
MADDOX and SEE, JJ., concur.
HOUSTON, COOK, and LYONS, JJ., concur specially.
ALMON, SHORES, and KENNEDY, JJ., dissent.
HOUSTON, Justice (concurring specially).
I was one of the four Justices who concurred in the opinion in Allied-Bruce Terminix Cos. v. Dobson, 628 So.2d 354 (Ala. 1993),[3] which the United States Supreme Court reversed in Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). Although I disagree with the majority of the United States Supreme Court in its Allied-Bruce interpretation of the Federal Arbitration Act as it applies to state courts, a majority opinion of that Court is part of the law I have taken an oath to uphold. See the second paragraph of Article VI of the Constitution of the United States. I agree with the belief expressed by Justice O'Connor in her special concurrence in Allied-Bruce, 513 U.S. at 283, 115 S.Ct. 834:
"I continue to believe that Congress never intended the Federal Arbitration Act to apply in state courts, and that this Court has strayed far afield in giving the Act so broad a compass."
(Citations omitted.) I also agree with the dissenting opinions of Justice Scalia and Justice Thomas in Allied-Bruce. However, Justice O'Connor's belief and the dissenting opinions of Justice Scalia and Justice Thomas are not the law that I have taken an oath to uphold.
I personalize Chief Justice Burger's special concurrence in Bifulco v. United States, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980):
"The temptation to exceed [my] limited judicial role and to do what [I] regard as the more sensible thing is great, but it takes [me] on a slippery slope. [My] duty, to paraphrase Mr. Justice Holmes in a conversation with Judge Learned Hand, is not to do justice but to apply the law and hope that justice is done. The Spirit of Liberty: Papers and Addresses of Learned Hand 306-307 (Dilliard ed.1960)."
447 U.S. at 401-02, 100 S.Ct. 2247 (Burger, C. J., concurring).
As I have in the past, I continue to oppose the judicial enforcement of predispute arbitration agreements, because of the state policy expressed in Ala.Code 1975, § 8-1-41(3). Unless that section is determined to violate the Constitution of Alabama or the policy expressed by that section is changed by acts of the Alabama Legislature, I will continue my opposition to the extent I am allowed to do so by the Constitution of the United States as interpreted by the Supreme Court of the United States.
COOK, Justice (concurring specially).
I concur in the conclusion that the plaintiff, Rev. John Phelps, is the "initiating party," as that term is used in Rule 6 of the American Arbitration Association's Commercial Arbitration Rules. That rule was incorporated by reference into the arbitration clause of the parties' purchase agreement. I write separately to express my concern that the factual circumstances that exist in this case present the question whether Reverend Phelps voluntarily, that is, knowingly and intelligently, consented to arbitration.
After this Court denied the mandamus petition filed by Reverend Phelps in this case, see Ex parte Phelps, 672 So.2d 790 (Ala. 1995), he moved the trial court to "restore *39 [the] case to the active docket and set it for a jury trial," on the ground that Dan Tucker Auto Sales, Inc. ("Dan Tucker"), had initiated the arbitration procedure but had not paid the filing fee. On February 28, 1996, Jefferson County Circuit Judge Thomas A. Woodall denied that motion. On June 26, 1996, Dan Tucker moved the court to dismiss the action for "failure to prosecute ... in a timely manner."
On July 23, 1996, Reverend Phelps moved the trial court to reconsider its order denying his motion to "restore [the] case to the active docket." He supported this motion with his own affidavit, stating in part:
"2. I am the plaintiff in that lawsuit filed against defendants in this matter. I am a minister with the Crestline Cumberland Presbyterian Church. My annual income is approximately $19,000.00. I have incurred significant expenses in purchasing and repairing the vehicle involved in this case. I also have expended sums in reimbursement of expenses incurred in the litigation of this case.
"3. It is my understanding if this case is to go to arbitration I must pay the sum of $1,500.00. It would result in a substantial hardship to me to pay the sum required to send the case to arbitration. If I am required to pay this sum I am not sure that I would be able to proceed with arbitration. This might effectively deny me the right to seek redress for the claims made against the defendants in this case.
"4. I would respectfully request the court to order that the defendants pay the sum required for the arbitration. [They] requested the arbitration and thus should be required to pay the sum required for arbitration."
(Emphasis added.)
Subsequently, Judge Woodall entered the following order:
"The court has considered [the] plaintiff's motion to reconsider and the affidavit attached thereto. It appears that the payment of a filing fee for arbitration would put a substantial and undue burden and hardship upon the plaintiff, a man of fairly limited means. Therefore, the motion to reconsider is granted, the court ordering as follows:
"1. All filing fees for arbitration shall be paid by the defendants who sought to compel arbitration.
"2. All other expenses of arbitration shall be borne by the party causing the expense to be incurred;
"3. The court reserves the right to reallocate responsibility for the filing fees upon completion of the arbitration; and
"4. This case is continued on the Administrative Docket for six (6) months to allow the completion of arbitration. Plaintiff's counsel shall provide a status report by January 29, 1997, or else the case shall be dismissed with prejudice at plaintiff's costs."
(Emphasis added.) Dan Tucker then petitioned this Court for a writ of mandamus directing Judge Woodall to vacate his order directing it to pay the fees necessary to initiate arbitration proceedings.
The facts of this case illustrate one of the many consequencesaltogether hidden from consumersof executing a contract containing an arbitration provision. The ability of consumers "to acquire basic goods and services" has, with increasing frequency, become dependent upon their acquiescence to written provisions requiring them to consent to arbitration and, thereby, to waive their rights to a trial by jury as guaranteed by U.S. Const. amend. VII, as to any claim that "may accrue to them" as a result of the transaction. Allstar Homes, Inc. v. Waters, 711 So.2d 924, 933 (Ala.1997) (Cook, J., concurring specially). In the typical consumer credit transaction, consumers are first apprised of the necessity of this waiver after they have already expended considerable time and expense in negotiating the essential terms of their bargain. Id. at 933. A "contract" that requires consumers to acquiesce in this manner is, in fact, "punitive," because its rejection at that point in the transaction would result in the forfeiture of the time and expense a consumer has already incurred in the bargaining process. A "contract" to which a consumer is thus forced to acquiesce is adhesiveit is not truly voluntary. Id. at 933.
*40 But "volition is the sine qua non," not only of an effective waiver, but of the constitutionality of the Federal Arbitration Act, 9 U.S.C. § 2 ("the FAA"), which requires specific performance of written arbitration provisions. Allstar Homes, 711 So.2d at 933.
In consumer cases such as this one, although the consumer's attention may be drawn to the fact that his "contract" contains an arbitration provision, it is seldom, if ever, directed to the fact that he will have to do what will, in many cases, be prohibitively expensive, in order to obtain any review of his claim. This is the essence of Reverend Phelps's affidavit testimony, specifically:
"It is my understanding if this case is to go to arbitration I must pay the sum of $1,500.00. It would result in a substantial hardship to me to pay the sum required to send the case to arbitration. If I am required to pay this sum I am not sure that I would be able to proceed with arbitration. This might effectively deny me the right to seek redress for the claims made against the defendants in this case."
(Emphasis added.) In other words, Reverend Phelps asserts that although he may have been aware of the existence of the arbitration provision at the time this contract was executed, he was only subsequently confronted with the substance of the requirement to arbitrate, in this case, the cost of initiating the proceedingsa substance he had not contemplated and for which he had not bargained. The fact that this cost is entirely hidden from the consumer is merely another example of evidencebut a clear one that the consumer did not "agree," in a knowledgeable and intelligent manner, to the arbitration provision with the volition necessary to render the provision enforceable.
As the evidence in this case illustrates, a consumer not only must acquiesce in arbitration, but must, pursuant to the Rules of the American Arbitration Association ("AAA"), also prepay the fee to commence arbitration. The fee is substantial, as the following fee schedule, published as a part of the AAA's Commercial Arbitration Rules, illustrates:
"ADMINISTRATIVE FEES
"The administrative fees of the AAA are based on the amount of the claim or counterclaim. Arbitrator compensation is not included in this schedule. Unless the parties agree otherwise, arbitrator compensation and administrative fees are subject to allocation by the arbitrator in the award.
"Filing Fees
"A nonrefundable filing fee is payable in full by a filing party when a claim, counterclaim or additional claim is filed, as provided below.

"Amount of Claim Filing Fee
"Up to $10,000 ...........................$500
Above $10,000 to $50,000 .................$750
Above $50,000 to $100,000 ..............$1,250
Above $100,000 to $250,000 .............$2,000
Above $250,000 to $500,000 .............$3,500
Above $500,000 to $1,000,000............$5,000
Above $1,000,000 to $5,000,000 .........$7,000

"When no amount can be stated at the time of filing, the minimum fee is $2,000, subject to increase when the claim or counterclaim is disclosed.
"When a claim or counterclaim is not for a monetary amount, an appropriate filing fee will be determined by the AAA.
"The minimum filing fee for any case having three or more arbitrators is $2,000.
"The administrative fee for claims in excess of $5,000,000 will be negotiated."[4]
These fees are subject to change, and the fees that are "applicable" are those that are "in effect when the fee or charge is incurred." Rule 48. Indeed, the schedule currently applicable requires Reverend Phelps to prepay $2,000that is $500 more than would have been required at the time he filed his affidavit.
Although I concur in the holding that Reverend Phelps is the initiating party, I have serious reservations as to whether he voluntarily, that is, knowingly and intelligently, consented to arbitration, thereby waiving his right to trial by jury. Because, however, he has not made that specific argument, this case is not postured for resolution of that question. Under the posture of this particular case, therefore, I agree that the petitioner is entitled to a writ of mandamus.
*41 LYONS, Justice (concurring specially).
Today, we release another in a series of cases in which I, as a recently appointed Justice, have been called upon to cast the deciding vote. I concur in the opinion of Chief Justice Hooper; however, because my vote overrules a minister's plea of financial hardship in an arbitration proceeding involving his purchase of a used automobile, I am compelled to explain my position in this difficult area of the law. I do not choose to leave my views in this area vulnerable to the charges of either hypocrisy or insensitivity.

I.
My vote implicitly embraces the United States Supreme Court's teachings on arbitration in Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995),[5] and I write to address this question: Can a Justice on this Court, with intellectual honesty, accept Terminix and, at the same time, strenuously protest that the Tenth Amendment is being disregarded by the United States Supreme Court's use of the Fourteenth Amendment as the vehicle to regulate state action, on a theory of incorporation of the Bill of Rights of the United States Constitution that contradicts an objective weighing of historical evidence as to the intent of the framers of the amendment? I answer the question in the affirmative, for two reasons, one based upon the different source of federal constitutional authority at issue and the other based upon questions concerning the underlying Alabama constitutional guaranty of a remedy by arbitration for those who choose this alternative means of dispute resolution.
In Terminix, the Commerce Clause (Art. I, § 8) was the only aspect of the United States Constitution under consideration. The questions raised were whether Congress, in enacting the Federal Arbitration Act ("FAA"), intended the words "involving commerce"[6] to have the same meaning as the words "affecting commerce," and whether Congress intended the Act to apply in state courts as well as in federal courts. Our founding fathers were obviously convinced of the need "to regulate commerce ... among the several states," because the Constitution expressly provides for Congress to do so.
The interpretation of the scope of the power delegated to the United States by the Commerce Clause obviously affects the quantum of rights reserved to the states or to the people under the Tenth Amendment.[7] However, no one can argue in good faith that the power to regulate commerce was not within the range of the power "delegated to the United States by the Constitution," as that phrase is used in the Tenth Amendment in setting out that which is within the sovereignty of the United States.
Charges of abuse of power once conferred are fundamentally different from allegations of usurpation of power. Mundane questions of statutory construction are simply not comparable to issues of extension of the Constitution into new territory by judicial fiat rather than through an amendment ratified by the people. No amount of hyperbole about the sacred right to trial by jury can escalate Terminix into a category beyond its status as a case involving construction by the United States Supreme Court of an act of Congress in a sphere where it undisputedly has the power to act. To be sure, the construction adopted in Terminix gives teeth to arbitration agreements so that parties who contract away their right to a jury trial will now have to live with their bargain. If this result works a miscarriage of justice, the fault lies with the legislative body that enacted the FAA, and not with the judiciary.

II.
What if one accepts that the decision in Terminix is an assault on fundamental rights? Does this conclusion require that we, as state court judges, whose oath is to the Constitution and the laws of the United *42 States enacted in pursuance thereof,[8] and not to the United States Supreme Court, must, in fidelity to discontent with judicial activism and to the strength of our own convictions, ignore the case in favor of the laws of the State of Alabama? But, if we do so, such inquiry into state law yields a mixed signal as to the acceptability of arbitration as an alternative means of dispute resolution. On the one hand, the Alabama Constitution of 1901 enshrines the right to trial by jury at § 11, but, on the other hand, at § 84, provides that "[i]t shall be the duty of the legislature to pass such laws as may be necessary and proper to decide differences by arbitrators to be appointed by the parties who may choose that mode of adjustment." A provision empowering the legislature to pass laws to effectuate agreements to arbitrate has been a part of every Alabama Constitution since statehood. The legislature has discharged this duty by enacting Ala.Code 1975, § 6-6-1 et seq., to provide a system of arbitration parties may choose to avail themselves of after a dispute has arisen. However, the legislature also has exercised its power in this area by making predispute arbitration agreements unenforceable; see § 8-1-41.
This Court has stated that § 84 is merely "directory," in a case challenging the provisions of now superseded statutes providing for umpires to fix the value of improvements upon redemption of real property. Stevenson v. King, 243 Ala. 551, 10 So.2d 825 (1942). Moreover, early on this Court agreed with the legislature that predispute arbitration agreements are void on "public policy" grounds. See Bozeman v. Gilbert, 1 Ala. 90 (1840). Since then, the Court has continued to embrace a dichotomous public policy argument that encourages arbitration as a means of alternative dispute resolution, but disdains predispute arbitration agreements that would oust our courts of their jurisdiction. Wells v. Mobile County Bd. of Realtors, 387 So.2d 140 (Ala.1980).[9]
The Court's treatment of § 84 in Stevenson as "directory" is not accompanied by citation to authority. I note that, for purposes of construing the Constitution, the word "shall" is presumptively mandatory unless something in the character of the provision being construed requires that it be considered differently. Hornsby v. Sessions, 703 So.2d 932 (Ala.1997). Section 84 specifies that "[it] shall be the duty of the legislature...." (Emphasis added.) Moreover, the evils of transplanting the rules of construction that distinguish between mandatory and directory statutes into the realm of constitutional provisions have long been recognized. See Perry County v. Selma, M. & M.R.R., 58 Ala. 546 (1877) (stating that such activity took a court into "dangerous ground," and citing Cooley, Constitutional Limitations). Perry County was cited with approval in Gafford v. Pemberton, 409 So.2d 1367 (Ala.1982).
Has the legislature frustrated the will of the people, as set out in § 84, by enacting a law that is hostile to predispute arbitration? Or, has the legislature done what is "proper and necessary" by enacting § 6-6-1 et seq. as an alternative form of dispute resolution, while also enacting § 8-1-41 as a safeguard to the right to jury trial? If this Court is given the opportunity to address the implications of § 84 and, in doing so, determines that Stevenson incorrectly treats § 84 as directory, the Court will again be faced with the proper role of stare decisis when a constitutional construction is found to be incorrect.[10]
*43 These issues of state law are intriguing, but they are for another day. In the meantime, until Congress[11] should amend the FAA, I will continue to apply that Act to the cases coming before me; my application of the Act will be consistent with the principles of construction of the Act laid down by the Supreme Court of the United States, and I will apply the Act with a clear conscience on the issue of consistency with deeply held principles of constitutional law.

III.
Turning to issues of state law in the instant case, I do not find the plea of financial hardship in the area of arbitration to be totally irrelevant to the issue of enforceability of an arbitration agreement. The FAA, 9 U.S.C. § 2, expressly carves out a zone of primacy of state law by authorizing prohibition of enforcement of an arbitration clause that is invalid, "upon such grounds as exist at law or in equity for the revocation of any contract." Alabama has long recognized the doctrine of unconscionability as a defense to enforcement of a contract. See, e.g., Keeble v. Keeble, 85 Ala. 552, 5 So. 149 (1888). While Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), relegates challenges to the validity of the contract as a whole to the arbitrator, a challenge to the arbitration clause only is properly determined by the court. Wheat, First Securities, Inc., v. Green, 993 F.2d 814 (11th Cir.1993); Rhode v. E & T Investments, Inc., 6 F.Supp.2d 1322 (M.D.Ala.1998); Rollins, Inc. v. Foster, 991 F.Supp. 1426, 1431 (M.D.Ala.1998).
As noted by Judges Ira DeMent and Myron Thompson, respectively, in Rhode and Rollins, unconscionability, under general principles of Alabama law, can be reduced to a four-part test: (1) whether there is an absence of meaningful choice on one party's part; (2) whether the contractual terms are unreasonably unfavorable to one party; (3) whether there was unequal bargaining power between the parties; and (4) whether the contract contained oppressive, one-sided, or patently unfair terms. Layne v. Garner, 612 So.2d 404, 408 (Ala.1992).
I believe that a showing of financial hardship, lack of choice, and one-sidedness could, in a proper case, lead to a finding of unconscionability and a concomitant holding of unenforceability of an arbitration agreement that would not conflict with governing federal law. It is hornbook law that an arbitration agreement will not be enforced against one who has not agreed to arbitrate a dispute, A.G. Edwards & Sons, Inc. v. Clark, 558 So.2d 358 (Ala.1990), and lack of choice is an important factor in a finding that a contract is unconscionable. Layne v. Garner, supra. Because § 84 turns on the parties' making a choice in favor of arbitration, it would appear that application of the doctrine of unconscionability would not offend § 84. However, in the instant case, only one component, financial hardship, is implicated and, standing alone, that factor is simply insufficient to either displace, or to justify rewriting, the agreement between the parties.
NOTES
[1] The "Retail Buyer's Order," attached as exhibit "A" to Tucker's petition, provides: "[I]n the event any dispute(s), under the terms of this contract of sale arise ... Dealer and the purchaser agree to submit such dispute(s) to binding arbitration, pursuant to the provisions of [9 U.S.C. § 1 et seq.] and according to the commercial rules of the American Arbitration Association then existing, in Birmingham, Alabama."
[2] We would also add that recently the American Arbitration Association announced its intention to ensure that the costs of arbitration are reasonable, by adopting the following "principle":

"PRINCIPLE 6. REASONABLE COST.
"1. Reasonable Cost. Providers of goods and services should develop ADR [alternative dispute resolution] programs which entail reasonable cost to Consumers based on the circumstances of the dispute, including, among other things, the size and nature of the claim, the nature of goods or services provided, and the ability of the Consumer to pay. In some cases, this may require the Provider to subsidize the process.
"2. Handling of Payment. In the interest of ensuring fair and independent Neutrals, the making of fee arrangements and the payment of fees should be administered on a rational, equitable and consistent basis by the Independent ADR Institution."
[3] Justice Kennedy concurred in the result, without writing, and thereby cast the fifth vote to affirm the judgment of the trial court.
[4] This fee schedule became effective July 1, 1996.
[5] The parties have not suggested that the Federal Arbitration Act, 9 U.S.C. § 1 et seq., is inapplicable.
[6] 9 U.S.C. § 2.
[7] "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend. X.
[8] U.S. Const. art. VI.
[9] Kentucky has the same constitutional provision concerning arbitration that we have. The judge-made "ouster of jurisdiction" doctrine that prevents arbitration of future disputes is not part of the fundamental policy of Kentucky. Kodak Min. Co. v. Carrs Fork Corp., 669 S.W.2d 917 (Ky. 1984), after remand, review denied, 809 S.W.2d 699 (Ky.1991).
[10] This Court recently confronted the issue in James v. Langford, 695 So.2d 1158, rehearing denied, 695 So.2d 1164 (Ala.1997) (See, J., dissenting).

Justice Hugo L. Black believed strongly that stare decisis had no role in matters of constitutional error. In defending the Supreme Court's duty to strike down even long-standing misconstructions of the Constitution, he stated:
"That decision [striking down a century-old rule as unconstitutional] rested upon the sound principle that the rule of stare decisis cannot confer powers upon the courts which the inexorable command of the Constitution says they shall not have. State obedience to an unconstitutional assumption of power by the judicial branch of government, and inaction by the Congress, cannot amend the Constitution by creating and establishing a new `feature of our constitutional system.' No provision of the Constitution authorizes its amendment in this manner."
Gwin, White & Prince, Inc. v. Henneford, 305 U.S. 434, 454-55, 59 S.Ct. 325, 83 L.Ed. 272 (1939) (Black, J., dissenting).
[11] Under the reverse preemption of the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq., state autonomy over matters of insurance is permitted. The Alabama legislature, if it saw fit, could, subject to § 84, restrict arbitration in insurance disputes without violating federal law.